TERRY W. MACKEY
Terry W. Mackey, P.C.
314 E. 21st Street
Cheyenne, WY 82001
Telephone: (307) 635-7517
Facsimile: (307) 635-7565
E-mail: terry.mackey@mbblawfirm.com

ANDREW L. PAYNE
Andrew L. Payne
Payne Mitchell Law Group
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone: (214) 252-1888
Facsimile: (214) 2520-1889
E-mail: andy@paynemitchell.com

FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING
NOV 19 2009
Stephan Harris, Clerk
Cheyenne

UNITED STATES DISTRICT COURT
DISTRICT OF WYOMING

| | |
|---|---|
| CHRISTINE NODINE, Personal Representative of the Estate of DAVID NODINE, *Plaintiff*, | **FIRST AMENDED COMPLAINT FOR NEGLIGENCE; PREMISES LIABILITY; AND WRONGFUL DEATH** |
| vs. | |
| JACKSON HOLE MOUNTAIN RESORT CORPORATION a Wyoming Corporation, *Defendant*. | Civil Action No. 09-CV-216 |

Christine Nodine, Personal Representative of the Estate of David Nodine, decedent, ("Plaintiff") files this First Amended Complaint and Jury Demand against Defendant Jackson Hole Mountain Resort Corporation (hereafter "Defendant" or "JHMRC") and in support, respectfully shows this Court as follows:

## I.
## NATURE OF CASE

1. This is a Wyoming diversity wrongful death action arising out of the tragic in-bounds avalanche death of David Nodine, which occurred on an "opened" run at the Jackson Hole Mountain Resort on December 27, 2008.

## II.
## PARTIES

2. Plaintiff, Christine Nodine, is the widow of David Nodine and the duly qualified and appointed personal representative of his estate. Christine is also the mother of David Nodine's child, A.C.N. Christine is a resident of Texas.

3. As a personal representative, Plaintiff is a proper wrongful death plaintiff under the Wyoming Wrongful Death Act, Wyo. St. § 1-38-102. Plaintiff brings this suit for the benefit of all persons entitled to recover under the Act, including, Christine; Christine and David Nodine's child, A.C.N.; David Nodine's parents, Doug and Catherine Nodine; and David Nodine's brother, Michael Nodine.

4. Defendant, Jackson Hole Mountain Resort Corporation, (hereafter "JHMRC") is a corporation created under and existing by the laws of the state of Wyoming with headquarters at Jackson Hole Mountain Resort, Box 290, 3395 Cody Lane, Teton Village, Wyoming, 83025.

## III.
## JURISDICTION AND VENUE

5. Jurisdiction is based on diversity of citizenship. 28 U.S.C. § 1332.

6. Plaintiff, Christine Nodine, is a resident of Texas. Defendant, JHMRC, is a Wyoming corporation.

7. The amount in controversy is substantially in excess of seventy-five thousand dollars ($75,000), exclusive of interest and costs.

8. In addition, the actions giving rise to this cause of action happened in this District, and Jackson Hole Mountain Resort Corporation transacts business and is "found" throughout the State of Wyoming. Accordingly, venue is permissible in this district and division pursuant to 28 U.S.C. § 1391.

## IV.
## FACTS

9. JHMRC is vicariously liable for the negligence of its employees under the legal theory of *respondeat superior*.

10. The United States of America was and still is the owner of real property, commonly known as the Jackson Hole Ski Area located at Teton Village, County of Teton, Wyoming.

11. At all relevant times, this real property was managed and controlled by JHMRC under a special use permit from the United States Forest Service, a division of the United States Department of Agriculture, a government agency, under the authority of the United States of America.

12. The United States Forest Service issued a special use permit to JHMRC for the operation of a ski area located on the land owned by the United States Forest Service at Teton Village, County of Teton, Wyoming.

13.     JHMRC as permittee and occupier of land owed a duty of care to users of the premises, such as David Nodine.

14.     David Nodine was issued a ski pass by JHMRC for which he paid valuable consideration.

15.     The 2008-2009 winter at the Jackson Hole Mountain Resort brought with it a snowpack dangerously prone to avalanches.

16.     JHMRC was well aware of the dangerous conditions that existed within the bounds of its resort when it made the decision to open the run in question to all skiers, including David Nodine.

17.     As a direct result of JHMRC's decision to open a run with a dangerous condition and JHMRC's failure to close the run to customer access due to this dangerous condition, David Nodine was killed by an in-bounds avalanche on an "opened" ski run.

18.     By way of additional background, the unstable snow pack should have been no surprise to the JHMRC. The instability started with early season rains on existing mountain snow. Specifically, there were rains in the mountains on November 13, 2008 and November 29, 2008. These rains created "rain crusts." Above the November 13 rain crust and below the November 29 rain crust, a weak layer of faceted snow developed in the snow pack.

19.     These rain crusts and the faceted snow predictably created weakness in the snowpack. As the season progressed and additional snow was piled on top of this weak layer, it was certain to and, in fact did, fail, resulting in avalanches.

20.     In a twenty-one day period including December 27, 2008, there were over 250 reported avalanches, with many more unreported avalanches.

21. These numerous avalanches included avalanches on closed runs at resorts.

22. But the avalanche that killed David Nodine was different because it occurred in-bounds at the JHMR on a run the JHMRC had decided to "open" to the public.

23. The existence of the rain crusts and faceted snow and its likelihood of creating avalanches, would and should have been apparent to JHMRC before December 27, 2008, the date David Nodine was killed by an in-bounds avalanche on an "opened" run.

24. Indeed the warning signs should have been abundantly clear to the resort. On December 19, 2008, Bad Medicine Resort explosively triggered a slab avalanche with a crown depth of six feet on a closed run. Predictably, the snowpack failed on the November rain crusts and faceted snow.

25. On December 20, 2008, there was an explosively triggered avalanche on a closed run at Grand Targhee Resort and a natural avalanche in the Green River Drainage area. Both snowpacks failed on the rain crusts and faceted snow.

26. In the six days before David Nodine was killed, heavy snows deposited at least 42 inches of new snow on top of the known weak layers of rain crusts and faceted snow.

27. Not surprisingly, the number of avalanches increased.

28. There were at least 2 avalanches in the Jackson Hole area on December 21 & 22, 2008.

29. On December 23, 2008 there were two back country skier triggered avalanches in the Jackson Hole area. At least one naturally occurring avalanche slid. And three explosively triggered avalanches on closed runs at the JHMRC slid.

30. December 24, 2008 brought more snow and more avalanches. Natural and explosively triggered avalanches occurred at all three Jackson Hole area resorts. Multiple

other avalanches occurred on this day in the area. Large avalanches slid on highways south of Jackson and on the Teton Pass. They most likely failed on the November rain crusts and faceted snow.

31. JHMRC closed the upper mountain on December 25 & 26, 2008 as storms brought additional significant snow fall and with it the increased potential for avalanches.

32. JHMRC makes the majority of its revenue for the season in two weeks. One is the week of Christmas, and the other is the week of New Years.

33. As a result, JHMRC is under financial pressure to open the mountain to skiers during its busiest and most profitable weeks.

34. So on December 27, 2008, JHMRC made the ill-advised decision to open the Upper Mountain at the Jackson Hole Ski Resort.

35. On December 27, 2008, prior to the avalanche that killed David Nodine, skiers produced slides in the Alta Chutes and Amphitheater Rocks, both runs at the Jackson Hole Ski Area.

36. On December 27, 2008, the avalanche forecast was for: "dangerous unstable slabs on steep terrain. Human triggered avalanches were considered probable."

37. Despite this forecast, explosive charges failed to trigger an avalanche on the in-bounds run of Toilet Bowl.

38. This left the Toilet Bowl run a "time bomb," which was bound to slide soon just as had other similar runs. Nevertheless, JHMRC made the bad decision to open the run and not even provide a stern warning to skiers of the probable avalanche danger on this slope.

39. Back country skiers must evaluate avalanche dangers and decide whether it is safe to proceed.

40. Skiers who choose to ski at a controlled resort, on in-bound runs, rely upon the resort to take avalanche precautions, make reasonable decisions regarding whether it is safe to ski without risk of avalanche and to inform and warn the skiers of any avalanche risk that may exist on a particular day.

41. On December 27, 2008, JHMRC made the unreasonable decision to open Toilet Bowl, which based on the snow pack, the recent weather history, the other slides, the forecast and the lack of a triggered release, was an avalanche time bomb.

42. On December 27, 2008, JHMRC knew that skiers such as David Nodine relied on JHMRC being reasonable in its decision to open runs.

43. On December 27, 2008, JHMRC failed to inform skiers such as David Nodine of the risk of an avalanche that existed on Toilet Bowl that day so that they could make an informed decision to ski or to not ski that run. Unlike the risk of falling while skiing or being injured on a lift, an avalanche is not an inherent risk that any level of skier can assume, would be able to suspect, or make an informed decision to avoid. Leaving the decision to ski or not ski an avalanche slope is not up to the skier. JHMR should have closed any area with a probable avalanche risk, and keep it closed until the danger was abated.

44. On December 27, 2008, David Nodine and his other friend skied onto the Toilet Bowl run.

45. Toilet Bowl was open to the public for skiing.

46. David Nodine's skis came off. David's friend helped him balance and hold his skis in place while David attempted to clip his boots back into the bindings. During this time, the avalanche started. The snowpack predictably failed at the November rain crust and the faceted snow. The avalanche ran 675 feet. David Nodine was pulled into the descending snow. He was buried alive 7 feet below the surface and eventually died of asphyxiation.

47. David Nodine left behind a wife, an infant child, parents and siblings.

## V.
## CAUSES OF ACTION

*FIRST CAUSE OF ACTION: NEGLIGENCE*

48. Plaintiffs incorporate paragraphs 1-47 as though fully set forth herein.

49. Nodine's death was caused by the wrongful acts and neglect of Defendant, JHMRC. Defendant knew or reasonably should have known about the nature and extent of the hazard that the ski run presented to Nodine and other skiers. Defendant failed to fulfill its legal duties to the patrons when it opened an unstable ski area.

50. JHMRC is liable for the damages caused by the avalanche and subsequent asphyxiation because the accident was foreseeable and preventable. JHMRC knew or reasonably should have known of the dangerous propensities for opening an avalanche slope after dynamite charges on the mountain failed to cause an avalanche. JHMRC knew that a substantial residual avalanche risk remained on the faceted snow and made the imprudent decision to open the area, which resulted in David Nodine's death.

51. Specifically, Plaintiff will show that, in addition to its negligent failure to warn of danger on the slope and negligent misrepresentation about the safety of the ski area,

JHMRC was negligent in opening areas of its ski terrain, specifically the Toilet Bowl, when it should have been able to predict that a substantial avalanche risk remained and existing data indicated that the area was unstable.

52. JHMRC failed to fulfill its legal duty to take all reasonable steps to make the area known as the Toilet Bowl safe to ski before opening the slope and failed to take all reasonable precautions to alert skiers that the slope was hazardous before opening it to the public.

53. David Nodine did not assume the risk of skiing the opened Toilet Bowl area. ("We have made clear that a duty of care may arise from choices made for the participant by the recreation provider." ) *Dunbar v. Jackson Hole Mountain Resort Corp.*, 392 F.3d 1145, 1148 (10th Cir. 2004)). JHMRC made the decision to open the Toilet Bowl run, not David Nodine. JHMRC was negligent in making the decision to open Toilet Bowl. And JHMRC was negligent in failing to warn skiers of the dangerous conditions that existed on Toilet Bowl. The ski slope was opened with no warnings or dangers listed. JHMRC did not post a warning or alert skiers that the area was hazardous.

54. The negligent actions described above were a proximate cause of David Nodine's, injuries, death, and Plaintiff's damages described in this complaint.

*SECOND CAUSE OF ACTION PREMISES LIABILITY*

55. Plaintiffs incorporate paragraphs 1-47 as though fully set forth herein.

56. At all times herein mentioned, JHMRC leased, maintained, controlled, managed and operated the business premises known as the Jackson Hole Ski Area, specifically the Toilet Bowl run where David Nodine was killed.

57. On December 27, 2008, David Nodine was skiing an opened avalanche slope known as Toilet Bowl after purchasing a pass for valuable consideration. As such, JHMRC owed a duty of care to David Nodine.

58. On December 27, 2008, JHMRC negligently maintained, managed, controlled and operated the Jackson Hole Ski Area in that it knew, or in the exercise of reasonable care, should have known, that the Toilet Bowl Run on that day with the conditions described above, constituted a dangerous condition and presented an unreasonable risk of harm to skiers, such as David Nodine.

59. JHMRC failed to take reasonable steps to make the condition described above safe for skiers such as David Nodine.

60. JHMRC failed to warn skiers, such as David Nodine, of the dangerous condition.

61. The negligent actions in failing to make the premises safe and in failing to warn of the dangerous conditions, were a proximate cause of David Nodine's, injuries, death, and Plaintiff's damages described in this complaint.

*THIRD CAUSE OF ACTION NEGLIGENT TRAINING AND/OR SUPERVISION*

62. Plaintiff's incorporate paragraphs 1 through 47 as though fully set forth herein.

63. Plaintiff is informed and believes that in doing the acts alleged, JHMRC was negligent because it knew, or in the exercise of reasonable diligence should have known, its employees, were neither qualified nor able to safely design or implement an avalanche control plan and that an undue risk to persons such as David Nodine would exist because of this lack of ability unless JHMRC adequately trained and supervised its employees, in the exercise of the tasks of their employment.

64. Notwithstanding the knowledge that JHMRC employees were neither qualified nor able to safely design or implement an avalanche control plan at the Jackson Hole Ski Area, JHMRC negligently failed to adequately train or supervise its employees in their performance of their jobs at the Jackson Hole Ski Area.

65. The failure of JHMRC to adequately train and supervise its employees, was a proximate cause of plaintiff's damages.

## VI. DAMAGES

66. As a direct and proximate result of the negligent acts mentioned above, David Nodine was injured and killed, and his heirs sustained the following recoverable damages, for which they hereby sue:

a. All damages, pecuniary and exemplary, allowed pursuant to Wyoming Wrongful Death Act § 1-38-101;

b. Economic & pecuniary losses in excess of the jurisdictional minimums of this court;

c. General damages for loss of probable future care, companionship and comfort in excess of the jurisdictional minimum of this court;

d. Loss of services & income; and

e. All other damages allowed under the law.

## VI. JURY DEMAND

67. Pursuant to Rule 38(c), Fed.R.Civ.P., Plaintiff demands her right to trial by jury.

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendant be cited to appear and answer herein, and that upon final trial, Plaintiffs have judgment

against Defendant for those damages described above and in the full amount by law, specifically including, but not limited to the following relief:

    a.    Judgment against Defendant for all economic and pecuniary losses, in amounts to be established by the evidence at trial.

    b.    Judgment against Defendant for general damages in amounts to be established by the evidence at trial.

    c.    Judgment against Defendants for Plaintiffs' recoverable costs and expenses incurred in prosecuting this action.

    d.    Judgment for compensatory damages against the Defendant JHMRC in an amount to be determined by the trier of fact, and all other and further relief, including costs of court and pre-judgment and post-judgment interest, to which she may show herself to be entitled to under the law and on the facts.

    e.    Such other relief whether at law or in equity, to which Plaintiffs may show themselves justly entitled, as the Court deems just and equitable.

DATED this 18th day of November, 2009.

Respectfully submitted,

/s/ Terry W. Mackey
**TERRY W. MACKEY**
Terry W. Mackey, P.C.
314 E. 21st Street
Cheyenne, WY 82001
Telephone: (307) 635-7517
Facsimile: (307) 635-7565
E-mail: terry.mackey@mbblawfirm.com


/s/ Andrew L. Payne
**ANDREW L. PAYNE**
Payne Mitchell Law Group
2911 Turtle Creek Blvd., Suite 1400
Dallas, Texas 75219
Telephone: (214) 252-1888
Facsimile: (214) 252-1889
E-mail: andy@paynemitchell.com

**ATTORNEYS FOR PLAINTIFF**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiff's First Amended Complaint and Jury Demand was served on the following via U.S. Mail on the 18th day of November, 2009.

James K. Lubing
350 E. Broadway
P. O. Box 3894
Jackson, WY 83001
Fax: 307-733-7471

/s/ Andrew L. Payne
**ANDREW L. PAYNE**